# EXHIBIT C

COMMONWEALTH OF KENTUCKY
HARDIN CIRCUIT COURT
DIVISION THREE (3)
CASE NO:   04-CI-00214

AMY CURRY, and
DAIMA CURRY, her husband,
individually and as next
Friend of GERALD CURRY age 9
and KEYONA DURRY age 2, her
Children                                        PLAINTIFF


VS.


WYETH, INC., et al                              DEFENDATNS




            DEPOSITION  FOR  DEFENDANTS




DEPONENT:  KEITH ALTMAN

DATE:     MARCH 4, 2005



REPORTER:  TREVA L. BELANGER




        FULTON BELANGER & ASSOCIATES

            1310 NAVAJO COURT

        LOUISVILLE, KENTUCKY  40207

        (502) 897-1303 OR 1-800-726-0391

1          Q.        And then there are certain reports

2     that you run at the request of attorneys; is that

3     right?

4          A.        That's correct.

5          Q.        Okay.  And the work in terms of

6     taking the data from Wyeth's databases and putting it

7     in a format so that you can run reports, that was all

8     done at the request of attorneys; is that right?

9                    MR. ADAMS:  Objection to form.

10         A.        Yes.

11         Q.        And which of the reports that you

12    have run were done specifically for the Curry case?

13         A.         I think there were a few reports

14    that we just added today, which I did fairly recently

15    since you were provided your disk the last time, and

16    those were specifically done at the direction of

17    counsel fairly recently.

18         Q.        And what are those reports about?

19         A.         The first report -- and I

20    conventionally, to keep things easy so that we

21    understand, these are all based on CDSSS.  I always

22    use Exhibit 4195 as the prefix, so what's I've called

23    Exhibit 4195Q are accounts of pulmonary hypertension

24    reports and pulmonary hypertension reports that I've

25    sent to the FDA.

1          A.          When you say summarized, I've done

2     charts that -- I have done some charts that count up

3     the number of ADEs post withdrawal.  I have also done

4     other charts that are not really summarized, which

5     are just purely narratives, this is what the

6     narrative said.  It's not -- I wouldn't call that a

7     summary.  It's just a listing of the narratives of

8     those reports.

9          Q.          Is it your understanding that Wyeth

10    did ADEs based upon legal complaints that it

11    received?

12         A.          That is my understanding, that's

13    true.

14         Q.          And do you know how many of the

15    post withdrawal ADEs for Pondimin and Redux relate to

16    legal complaints?

17         A.          I do not.  There isn't a -- I don't

18    know that there's an easy way to tell that, per se.

19    I think it's clear -- I think it's in the narratives

20    if it came from a legal complaint.  But I don't know

21    that there's a systematic way to determine all of the

22    reports for legal complaints.

23         Q.          Did you ever attempt to -- in any

24    of the charts that you did that talk about reports

25    received post withdrawal, make any notation of when

1      something was derived from a legal complaint versus a

2      report from a medical provider or another source?

3              A.       I believe for the charts that I did

4      that were surgery reports with narratives, I believe

5      you can read that for yourself in the narrative.

6      That would be the same way that I would have to tell

7      whether it was a legal complaint; so no, I didn't

8      systematically do that.

9              Q.       Now, other than -- let's aside the

10     one for narratives, because you have done charts

11     where you summarize ADEs where you present data on

12     their total numbers without presenting any

13     information from the narratives; is that right?

14             A.       That is correct.

15             Q.       And for those, there is nothing

16     where you say some percentage of the total reports

17     were legal complaints or not legal complaints; is

18     that right?

19             A.       That's correct.

20             Q.       And when it comes to the

21     narratives, the narrative is not the only place in an

22     ADE where you would look to see if something was

23     derived from a legal complaint; isn't that right?

24             A.       There's -- I don't believe there is

25     a box on a med watch ^ CHECK form for that.

1      Q.       What about the box where you list

2   the reporter?

3      A.       Well, since I don't get the

4   reporters I have no way to know.  Some of the

5   reporters were redacted before being provided to me,

6   so I would have no way to know who the reporter is.

7      Q.       Well, the name of the reporter is

8   redacted, but there's still information as to whether

9   it's a health care provider or a consumer or a

10  lawyer; right?

11     A.       I'm not sure whether there's an

12  indication whether there's a lawyer or not.  I would

13  have to check out the database, which we could do if

14  you wanted.

15     Q.       And to this point, you've never

16  done that kind of analysis?

17     A.       Nobody has asked me to do so.

18     Q.       That's not surprising to you given

19  that the people that asked you to do any of these

20  analyses or run any of these reports are plaintiff's

21  lawyers?

22              MR. ADAMS:  Objection to form;

23  speculation.

24     A.       I have no idea why or why I was not

25  asked or would have been asked or anything.

1          Q.      Is it correct that the people who

2    have asked you to run all of these reports are

3    plaintiff's lawyers?

4                  MR. ADAMS:  Objection to form;

5    speculation.

6          A.      No, it's not correct.

7          Q.      Okay.  You have been asked to do

8    reports for a plaintiff by plaintiff's lawyers or

9    people working for plaintiff's lawyers?

10          A.      I think the vast bulk of them,

11    that's true.  I may have been asked by some experts

12    to provide information.  I just don't recall

13    specifically.  But yes, if you're asking me was it

14    generally connected with plaintiff litigation, yes.

15          Q.      I'm sorry, maybe I lost you.  You

16    said that there had been some changes to your CV in

17    the last couple of weeks?

18          A.      Well, that was the testimony of

19    Pittman.

20          Q.      Okay.  And that's the only other

21    change?

22          A.      I believe that's it.  Well, there

23    was one other thing.  I mean I testified at the

24    Federal Rules Committee to change the federal rules

25    on electronic information, but I don't know if that's

1    necessarily have direct contact with.

2          Q.        How is that set up; do you go

3    through somebody; do you have contact?

4          A.        There are other consultants who ask

5    me to do -- you know, who may ask me to do various

6    safety analyses or things like that.

7          Q.        Okay.  Just so I understand, the

8    way it works is you are kind of subcontracting to

9    somebody who is a consultant to a drug manufacturer;

10   is that right?

11         A.        Yes.  In some cases, that's

12   correct.

13         Q.        Are you a direct consultant to any

14   drug manufacturers?

15         A.        I don't know.  I don't know the

16   exact relationship.  I don't know, I don't think the

17   check comes directly through the manufacturers, but

18   I'm in the loop with the manufacturer and the

19   consultants.

20         Q.        Have you ever been a consultant

21   directly to a drug manufacturer?

22         A.        On my own, no.

23         Q.        Well, has -- you're still with

24   Finkelstein and Partners; right?

25         A.        That's correct.

1    something where you noticed it and brought to their

2    attention; is that right?

3            A.      It was a very serious defect in the

4    way they had been producing the data, so serious that

5    they have abandoned that, what they were doing.  They

6    had to change completely and redo the way they were

7    doing things.

8            Q.      My question was just simply that

9    was something you noticed and brought to their

10   attention as opposed to them asking you to conduct an

11   analysis of their system?

12           A.      That's true.

13           Q.      Okay.  That's fine.

14                   Has the nature of your relationship

15   with Finkelstein and Partners changed at all?

16           A.      No.  I'm an employee of the firm.

17           Q.      And what's your exact title there?

18           A.      I've been going under the director

19   of adverse event analysis.

20           Q.      Okay.

21           A.      I don't have a clear cut -- I don't

22   have a clear cut title.

23           Q.      And are they still a plaintiff's

24   personal injury firm?

25           A.      That's correct.

1          Q.        Have you had any formal training

2     since October of 2003?

3          A.        What do you mean by formal?

4          Q.        Do you have any new degrees; have

5     you taken any new for-credit-classes; do you have any

6     formal training?

7          A.        In what?

8          Q.        In anything.

9          A.        Yeah.  I'm currently in law school.

10         Q.        Okay.  And when did you start law

11    school?

12         A.        October of 2003.

13         Q.        Where are you in school?

14         A.        Concord School of Law.

15         Q.        I'm sorry, I've never heard of it.

16    Is that a correspondence school?

17         A.        Yes.

18         Q.        Is it an Internet school?

19         A.        Yes.

20         Q.        And when do you expect to graduate

21    from this Internet law school?

22         A.        December of 2007.

23         Q.        Okay.  I don't know that we really

24    got there, but last time when you were deposed there

25    were a number of questions about your departure from

1    Fibonacci Systems and your -- certain information

2    that they might have in their possession that you

3    said you weren't able to obtain and you were going to

4    try to find it.  Did you ever any contact with

5    Fibonacci Systems looking for any of that stuff?

6         A.       No, I did not.

7         Q.       And when you were at Fibonacci you

8    did some work for defense, and then after a while it

9    really became all for plaintiffs; is that about

10   right?

11        A.       Some work for defense.  I've not

12   ever worked for the defense in a personal injury

13   context.

14        Q.       Okay.  And maybe I was wrong then.

15   When you were -- when you worked on breast implant

16   litigation, that was for defendants?

17        A.       No, that was for plaintiffs.

18        Q.       Oh, I'm sorry.  So on your CV when

19   it says, assist in preparations for trials for

20   Baxter, 3M and Bristol-Myers Squibb, you're not

21   really saying on behalf of them as --

22        A.       As preparing the trials for each of

23   those three -- against each of those three defendants

24   which have completely different sets of exhibits and

25   things like that.

1          Q.       So when you say assisted in

2   preparation for trials for Baxter, 3M and

3   Bristol-Myers Squibb, it really should be against

4   Baxter, 3M and Bristol-Myers Squibb?

5                   MR. ADAMS:   Objection to form.

6          A.       I can see your confusion, yes.

7          Q.       Okay.  Well then let's go back to

8   this.  You have never done any consulting work on

9   behalf of a defendant in a personal injury lawsuit?

10         A.       If I did it would have been very

11  minimal.  I mean there could have been some inquiries

12  that I fielded on behalf of some people that could

13  have been used for that, but not substantive to the

14  same level that I've worked.

15         Q.       Uh-huh.  So when we look on your

16  CV, it talks about various individual litigations and

17  breast implant.  It doesn't specify the party, but we

18  know it's really for the plaintiffs; right?

19         A.       That's correct.

20         Q.       And for Phen-Fen you actually do

21  say it's a plaintiff consultant.  But for Propulsid,

22  Rezulin, MTBE, Cooper Tire, Lotronex, PPA, they call

23  Accutane, OxyContin, Vioxx, Celebrex, Lariam, Enbrel

24  ^ CHECK, Remicade and Neurontin, it doesn't identify

25  who you worked for; is that right?

1       A.      I do.

2       Q.      Okay.  And that was something that

3    you hadn't seen for about five years before that?

4       A.      That's correct.

5       Q.      Okay.  Do you have --

6       A.      And haven't seen it since.

7       Q.      Do you have a document like that

8    for the meaning of the fields in the SQ database?

9       A.      No, I don't believe they provided

10   such a field.

11      Q.      How do you know what the fields

12   mean?

13      A.      I've worked on probably eight or

14   ten adverse event systems of various different kinds,

15   and based on my experience in working with those

16   databases, the fields are fairly clearly labeled as

17   to what they are.  It's not really a -- I hate to use

18   the term rocket science, but it's not rocket science

19   to figure out what most of the fields are.

20      Q.      It's not astrophysics, huh?

21      A.      It's not astrophysics.

22      Q.      I think we're up to eight.  Do you

23   have anything for eight?

24      A.      Other than --

25      Q.      Anything else for eight?

1          Q.      14, retention agreement.  Do you

2    have any retention agreements with plaintiff's

3    counsel?

4          A.      No.

5          Q.      Just oral?

6          A.      Just oral.

7          Q.      All communications between you and

8    representatives of plaintiffs.  Do you have anything

9    in writing relating to your communications?

10         A.      Other than transmittals of the

11   various reports, no.

12         Q.      Okay.

13         A.      Doctoral.

14         Q.      I'm sorry?

15         A.      Doctoral.

16         Q.      Where does it say doctoral at?

17   That's funny.  I don't know how that one slipped in

18   there.

19         A.      I've been called anything and

20   everything.

21         Q.      You are definitely not a doctor;

22   right?

23         A.      I am definitely not a doctor.

24         Q.      Let me show you what we got as a

25   summary of your testimony for the Curry case.  It's a

1        Q.     But you know that the FDA had

2  received Pondimin, pulmonary hypertension reports

3  before that time?

4        A.    This is reflective of the database

5  that you provided, and the database you provided

6  doesn't indicate that.

7        Q.    Is it your understanding that

8  before July of 1991, FDA had received from Wyeth or

9  predecessor multiple reports of pulmonary

10  hypertension with Pondimin?

11       A.    I would have to -- I would have to

12  check that.  I don't have an understanding one way or

13  the other.

14       Q.    So R wasn't meant to -- I'm sorry.

15  4195R wasn't supposed -- meant to reflect the total

16  number of pulmonary hypertension cases actually sent

17  to the FDA.  Only the ones noted in the databases

18  have ^ CHECK been sent to the FDA?

19       A.    I don't know why there would be a

20  distinction between the two.

21       Q.    Whether you know why there would be

22  a distinction between the two, the answer is yes, it

23  was intended to reflect only as indicated in the

24  database, not necessarily the truth?

25             MR. ADAMS:  Objection to form.

1           A.        You know, a company conducts its

2    safety surveillance based on its database.  If its

3    database isn't the truth, then I think there's bigger

4    problems here than what we're talking about.  I mean

5    I take Wyeth at its word that this database is

6    accurate and how it did things, so that is what the

7    database shows.

8                     MR. ALEXANDER:  Well, move to

9    strike as nonresponsive.

10          Q.        You don't have any information here

11   about reporting in the '80s, do you?

12          A.        That is correct.

13          Q.        Okay.  So you're starting with zero

14   even though pulmonary hypertension reports for

15   Pondimin had been sent to the FDA in the 1980s?

16                    MR. ADAMS:  Objection to form and

17   foundation.

18          A.        I don't know whether that's true or

19   not.

20          Q.        Wasn't relevant to you?

21                    MR. ADAMS:  Objection to form.

22          A.        If it was not in the database, I

23   would say it was not in the database.  This is a

24   report from the database.

25          Q.        And when you talk about tallying up

1    reports sent to the FDA, you're only including what

2    an actual, full ADE was sent to the FDA during this

3    time period of January of '90 through July of '96; is

4    that correct?

5              A.        No, that's not true.

6              Q.        Okay.   Then how else do you

7    account -- what else counts for this?

8              A.        Well, in fact, I credited Wyeth

9    with three reports from the increased frequency

10   report done in 1991, even though, to the best of my

11   knowledge, they never sent an actual adverse event

12   report in, and the database does not reflect that

13   they were reported.   But I did, in fact, know that

14   that was true and I did -- and as far as in this

15   particular chart, I reviewed the periodic reports for

16   this period of time and verified how many were

17   actually sent in.

18             Q.        In August of -- August and

19   September of 1995, Wyeth provided to the FDA a list

20   that there were 52 reports of pulmonary hypertension

21   reported for Pondimin.   That wouldn't be reflected

22   here?

23                       MR. ADAMS:   Objection to form and

24   foundation.

25             A.        It's not in the database.

1          Q.        So it wouldn't be reflected on your

2    chart 4195R; correct?

3          A.        I don't know it happened.^ CHECK

4          Q.        Okay.

5          A.        I just don't have any knowledge.

6          Q.        And it wouldn't be reflected on

7    4195Q either that Wyeth informed the FDA in 1995 that

8    there had been 52 reports of pulmonary hypertension

9    with Pondimin?

10                   MR. ADAMS:  Objection to form.

11         A.        I don't know that that happened, so

12   I -- that is what's in the database.

13         Q.        Okay.  So because you don't know

14   that it happened, it wouldn't be reflected in 4195Q

15   or R --

16                   MR. ADAMS:  Objection.

17         Q.        -- is that right?

18                   MR. ADAMS:  I beg your pardon.

19   Objection to form; a mischaracterization of

20   testimony.

21         A.        Your database is your database.

22   That's what is in the database.  I can -- it's that

23   simple.  It's the database.

24         Q.        Well, look at the numbers.  You

25   don't ever get to more than 50 cases in 4195Q or R

1    pulmonary hypertension reports for Dexfenfluramine

2    and Fenfluramine together sent to the FDA is not at

3    all reflected on 4195Q and R?

4              A.         4195Q and R reflects what is in

5    CDSSS.

6              Q.         For Pondimin only?

7              A.         What is in CDSSS for, Pondimin

8    and/or Redux.  That's the database that was provided.

9    If it's in there, it's in there.  If it's not, it's

10   not.

11             Q.         Do you know it to be correct that

12   within the time frame covered by these two printouts

13   through July of '96, the FDA was aware of more than

14   150 total pulmonary hypertension reports for

15   Fenfluramine or Dexfenfluramine?

16                        MR. ADAMS:  Objection to form and

17   foundation.

18             A.         I haven't looked at the numbers.  I

19   don't know what the numbers are.

20             Q.         In fact, that number certainly is

21   not reflected on the 4195Q or R?

22             A.         4195Q or R reflect what is in the

23   database.

24             Q.         And the highest number that you're

25   representing was known to the FDA based upon what

1    you've described here as cumulative pulmonary

2    hypertension reports is just over 20 by July of '96;

3    is that right?

4              MR. ADAMS:  Objection to form; a

5    mischaracterization.

6           A.      If that is what is in your database

7    and that's what's in your periodic reports, that's

8    what's reflected there.

9           Q.      And in fact if the correct number

10    by July of '96 isn't just over 20 but it's more than

11    150, 4195Q and R would be wrong?

12              MR. ADAMS:  Objection to form; a

13    mischaracterization.

14           Q.      Is that right?

15           A.      I don't agree with that.

16           Q.      Just looking at 4195S, it talks

17    about the most frequent ADE terms, and the first one

18    is pulmonary hypertension through March of '95.  Keep

19    in mind that we talked about that the way the CDS was

20    produced was it was a snapshot as of '98 and as of

21    1999.

22             Now, when you say through March of

23    1995, are you talking about the terms that were

24    actually used in the reports as of that time, or are

25    you talking about based upon the database as it

1    detailed terms, top ten detailed terms?

2          A.      I don't think there would have been

3    a difference.  I mean I think they call hypertens,

4    pulm instead; and cardiovascular, DIS, I think is the

5    different term, but we could certainly do such an

6    analysis.

7          Q.      Is aortic insufficiency a detailed

8    term or a preferred term?

9          A.      Oh, I'd have to sit and look at the

10   chart.

11         Q.      Is valvular heart disease a

12   detailed term or a preferred term?

13         A.      I'd have to look at the chart.  I

14   don't remember.

15         Q.      Now, you talked about not having

16   information about reports from prior to 1990.  4195T

17   has 46 reports prior to 1990, doesn't it?

18         A.      You know, you're right.  Okay.

19         Q.      How can you reconcile that?

20         A.      Well, then -- that's not in the

21   database.

22         Q.      Well, it says right here the title

23   for 4195T --

24         A.      No, I understand what --

25         Q.      Hold on.  I'm not done.

1          It says right here on the title for

2   4195T, all Pondimin ADE reports in CDSSS through

3   3/1/95, and it includes 46 events that were received

4   before 1990, doesn't it?

5          A.      You're right.  I had forgotten

6   that.  Then, you know, getting back to your question

7   you asked me before, that your database does not

8   reflect the fact that they had sent Pondimin reports

9   to the FDA.

10          Q.      How many of these first 46 Pondimin

11   reports relate to pulmonary hypertension?

12          A.      None, according to your database.

13          Q.      Well, I'm talking about actually

14   looking at the reports.  Do you know if any of them?

15          A.      Yeah.

16                  MR. ADAMS:  Objection to form and

17   scope.

18          A.      This is a report out of your

19   database.

20          Q.      Have you looked at the reports

21   received through 12/11/89 for Pondimin?

22          A.      (No response from the witness.)

23          Q.      It's either -- you either have

24   looked at them or you haven't.

25          A.      Well, what do you mean by looked at

1    them?

2                    MR. ADAMS:  Objection to form;

3    argumentative.  Can you let him finish his answer?

4            A.      Are you asking me if I looked at

5    them in a database?  The database is what the

6    database shows.  Are you asking me have --

7            Q.      Have you looked at the underlying

8    reports?

9            A.      No.

10           Q.      Okay.  Do you know based on the

11   underlying reports if any of the first 46 events you

12   have listed on 4195T actually relate to pulmonary

13   hypertension?

14           A.      I have no idea.  Your database

15   doesn't reflect that.

16           Q.      Do you know if any of the first 46

17   Pondimin ADEs on your Exhibit 4195T are actually

18   pulmonary hypertension reports that were sent to the

19   FDA?

20           A.      According to your database, there

21   are no pulmonary hypertension reports in there.

22           Q.      And do you know based upon actually

23   looking at the underlying reports?

24           A.      I have not looked at the underlying

25   reports.

1          Q.       One other thing about Q, 4195Q and

2     R, when you talk about reporting to the FDA, you

3     haven't made any attempt to include literature

4     reports, have you, where a piece of literature

5     describing a pulmonary hypertension report was sent

6     to the FDA?

7          A.       If it's in the database, it's on

8     these charts.

9          Q.       I understand you're talking about

10    the database report.  I'm asking you did you do

11    anything where you included reports of pulmonary

12    hypertension sent to the FDA where the report was an

13    article in the published literature?

14         A.       You mean specifically to bring them

15    out from the database; is that what you're asking me?

16         Q.       I'm sorry.  I didn't hear you.

17         A.       Are you asking me, segregating

18    those out from the database?

19         Q.       I'm talking about whether it was in

20    the database or not.

21         A.       The database is the database.

22         Q.       So if there were reports from the

23    published literature of pulmonary hypertension sent

24    to the FDA through July of '96 that aren't in the

25    database as you understand it, then you didn't

1    valve, regardless of whether it was regurgitation or

2    something else and regardless of the level of

3    regurgitation?

4                    MR. ADAMS:  Objection to form and

5    foundation.

6            A.      I don't have any knowledge of that.

7            Q.      So when you talked about reports of

8    valvular heart disease in that durational chart, that

9    would include right sided regurgitation, no

10   regurgitation but something else relating to the

11   valves or levels of left sided valvular regurgitation

12   that were traced or mild mitral; is that right?

13           A.      I have no idea how the company used

14   the term valvular heart disease.  The database says

15   valvular heart disease and I produced the report that

16   way.

17           Q.      Have you ever tried to figure that

18   out --

19                   MR. ADAMS:  Objection to form.

20           Q.      -- how the company used valvular

21   heart disease at certain points in time?

22                   MR. ADAMS:  Objection to form and

23   scope and foundation.

24           A.      That wasn't the purpose of that

25   analysis.  The analysis was reports coded as valvular

1   heart disease.

2          Q.      Well, does it say coded as valvular

3   heart disease or does it just say VHD reports?

4          A.      Well, are you talking here?

5          Q.      On any of them.  Nowhere does it

6   say coded as valvular heart disease.

7                  MR. ADAMS:  Just for the record,

8   I'd like to put in there that Wyeth stipulated to the

9   authenticity of these charts for the Turley value.

10  ^ CHECK THIS.

11                 MR. ALEXANDER:  We didn't.  We

12  stipulated that the database was accurate as produced

13  at the time that the -- that the database that he was

14  using was the database that Wyeth produced as of

15  those dates.  I don't remember us saying anything

16  about his charts being accurate.  In fact, we've

17  always maintained that there are numerous

18  inaccuracies and problems with these charts that make

19  them misleading, and there should be no confusion in

20  the record about that, and we continue to maintain

21  that; but that's for another day.

22         Q.      So my question is when you have

23  these reports that say valvular heart disease

24  reports, you're talking about coding and the coding

25  is broader than certainly left sided FDA positive

1   valvular regurgitation; is that right?

2          A.        I don't know that that's true.

3          Q.        And you have never done anything to

4   take account of -- well, strike that.

5                    You have never done anything to

6   find out how Wyeth coded as valvular heart disease at

7   any point in time?

8                    MR. ADAMS:  Objection to the form;

9   irrelevant; scope.

10         A.        The database says valvular heart

11  disease.  That's what I reported.

12         Q.        Okay.  Is there a report that is

13  limited to left sided FDA positive valvular

14  regurgitation for any time period?

15         A.        No, I don't think so.   .

16         Q.        Is there a report that you've done

17  that's limited to primary pulmonary hypertension?

18         A.        No, I've not done a PPH report.

19         Q.        Is there a report that is limited

20  to pulmonary hypertension where alternative causes

21  have been ruled out?

22         A.        I would -- there is not reflected

23  in the database that way, so no.

24         Q.        Is there a report that's limited to

25  pulmonary arterial hypertension?

1    it belongs on that list or not.

2         Q.      So that includes people who had

3    valve surgery for some reason other than valve

4    regurgitation?

5         A.      I don't know what it includes.  All

6    the criteria -- I mean we can go through that report

7    now.  The criteria was it said it -- this person

8    underwent valve replacement surgery in no clinical

9    way.  I mean if it wasn't clear, it didn't show up on

10   that list.

11        Q.      We'll talk about that.

12        A.      Okay.

13        Q.      We're just going to stick with

14   4195A and walk through.

15        A.      That's fine.

16        Q.      When it says valvular heart disease

17   report, is it your testimony that the only reports on

18   this list are reports of valvular regurgitation of

19   some sort?

20        A.      That is correct.

21        Q.      And is it limited to left sided

22   valvular regurgitation?

23        A.      No, it is not.

24        Q.      Is it limited to FDA positive left

25   sided valvular regurgitation?

Page 109

1          A.       No, it is not.

2          Q.       You have 239 entries on this list

3    going up through the day after withdrawal, September

4    16th of 1997; is that right?

5          A.       Yes.

6          Q.       How many of those 239 are left

7    sided FDA positive regurgitation?

8          A.       Don't know.

9          Q.       How many of them are left sided

10   regurgitation?

11         A.       Don't know.

12         Q.       How many of them are -- well,

13   strike that.

14                  You, of course, made no attempt to

15   weed out reports that were of valvular regurgitation

16   that predated drug use; right?

17         A.       That's correct.

18         Q.       Okay.  So those would be included

19   in here?

20         A.       They would if such exists.  I don't

21   even know that they do.

22         Q.       Nobody has come to you and said,

23   you know, Mr. Altman, I want you to remove the

24   following entries because they're clearly pre-drug

25   valvular regurgitation?

1    Q.    And like 4195A, this doesn't take

2  into account anything about when the regurgitation

3  started, whether it was due to something else or the

4  level of regurgitation; right?

5    A.    I haven't done any of that.  That

6  was just -- this is purely objective criteria.

7    Q.    The idea was this would be an

8  identification of reports that then an actual medical

9  or scientific expert could look at and review the

10  reports themselves; is that right?

11    A.    I believe that was the intention,

12  sure.

13    Q.    Because you didn't -- you did not

14  attempt to review the underlying reports for any

15  substance?

16    A.    No.  It was an attempt to

17  understand the adverse event reporting processing of

18  the reports.

19    Q.    Has either version of 4195D changed

20  since July?

21    A.    I don't believe so.

22    MR. ALEXANDER:  We'll mark 4195D,

23  both versions together, as Exhibit 7.

24    (Deposition Exhibit 7 was marked

25  for identification and attached hereto.)

1          A.        That's correct.

2          Q.        And do you understand that the

3     majority of these fifty-seven hundred reports are

4     actually lawsuits?

5                    MR. ADAMS:  Objection to form and

6     foundation.

7          A.        I don't have an understanding one

8     way or the other.  I haven't looked at it.

9          Q.        And there's obviously no attempt to

10    account for whether valvular heart disease reflects

11    actual left sided valvular regurgitation; right?

12         A.        This was simply an account of how

13    many reports were coded as valvular heart disease by

14    the company.

15         Q.        And you don't know anything about

16    what their practice was for why they coded certain

17    things as valvular heart disease?

18         A.        I don't have any specific knowledge

19    of that.

20         Q.        If Wyeth coded any mention of

21    valves in any context, even if it was just a mention

22    of valves in a complaint as valvular heart disease in

23    the database in this time period, that would be

24    something that wasn't at all taken into consideration

25    by you in generating 4195E?

1              MR. ADAMS:  Objection to form and

2     foundation.

3         A.      That was just a list of how many

4     reports were coded as valvular heart disease or

5     cardiovascular disorder.

6         Q.      Which is it,  valvular heart

7     disease or cardiovascular?

8         A.      Well, the cardiovascular disorder

9     would have been before this particular report from

10    March 1st to the withdrawal because that's all they

11    used up to that point in time.

12        Q.      Well, they started using valvular

13    heart disease before withdrawal, didn't they?

14        A.      Not really before withdrawal, I

15    don't think so, not systematically.  I would have to

16    check.  Maybe they did.  I would have to check.  But

17    clearly the vast bulk of all those reports come in

18    after withdrawal anyway.

19        Q.      You're not saying that this report,

20    4195E, Exhibit 8 to your deposition; is intended to

21    show anything about how great the risk of Pondimin or

22    Redux were?

23        A.      It is -- I was asked to provide a

24    count of how many reports there were, and that's what

25    the report is.  How that gets interpreted by somebody

1        Q.        And can you just tell me how 4195G,

2    Deposition Exhibit 10 was generated?

3        A.        I did a search through all the

4    narratives in the database for reports coming in

5    after 9/15/97, looking for the words surgery and

6    replacement.  Once that was found, I then literally

7    read each and every single narrative confirming

8    whether or -- whether it did or did not say that the

9    person had replacement surgery or didn't say they had

10   replacement surgery; and if they did, what valve was

11   involved.

12       Q.        Does 4195G, Deposition Exhibit 10,

13   include reports of surgery for something other than

14   valvular regurgitation?

15       A.        It has the word valve replacement

16   surgery -- or what the purpose of that is, I didn't

17   determine that.  That's for an expert to decide.

18       Q.        So it may or may not as far as

19   you're concerned?

20                 MR. ADAMS:  Objection to form.

21       A.        I have no way to know one way or

22   the other.

23       Q.        And does 4195G, Deposition Exhibit

24   10, include reports of valve surgery that were before

25   the person took diet drugs?

1          Q.       Those would all be included on

2    4195G, based on the way you did it?

3          A.       No, I believe I would have excluded

4    something like that if it wasn't to a specific -- if

5    it wasn't to a specific patient.

6                   But frankly, I don't think those

7    would have been in this database at all because there

8    wouldn't have been adverse event reports.  If you

9    can't identify a specific patient, you wouldn't have

10   done an adverse event report.  So I don't think, to

11   the best of my knowledge, that those would have been

12   in here.

13         Q.       Do you know if Wyeth's practice

14   between '97 and let's say '99 was to do individual

15   ADEs for every plaintiff listed on the complaint; did

16   you know that?

17                  MR. ADAMS:  Objection to form.

18         A.       I don't know one way or the other.

19         Q.       Do you know if Wyeth's practice

20   was, when there was a complaint listing many

21   plaintiffs and there was a common assertion of the

22   type of injury that had been suffered by all, let's

23   say, 200 plaintiffs on a complaint, if there would be

24   then 200 ADEs generated that would include that

25   common description of alleged problems?

1          A.          I have no way to know.

2          Q.          Should those kind of reports be

3     included on here if one of the problems listed in the

4     laundry list of problems was surgery?

5                      MR. ADAMS:  Objection to form and

6     scope.

7          A.          I don't know one way or the other.

8     I don't know that that happened.  I don't know

9     whether that was done or not.

10         Q.          Did you attempt to delete those or

11    exclude those from any of your summaries of valve

12    replacement surgery?

13                     MR. ADAMS:  Object to form and

14    foundation.

15         A.          If there are individual reports in

16    there, I would not have excluded them.

17         Q.          Even if they were derived from what

18    I just explained of a complaint that actually didn't

19    allege that each person on the complaint had that

20    problem?

21         A.          Well, to be honest with you, I

22    don't think those were -- I don't know that they

23    should have been entered in as adverse events.  If

24    you don't have an identifiable adverse event to an

25    identifiable patient, I don't know that these are in

1    here.  But if the company decided to do something

2    that way, I don't have any way to know, and I just

3    simply looked at the narratives.  If the narratives

4    said they had surgery, it's on that list.

5          Q.       Can you tell -- well, can you

6    testify as to how many of the people on Exhibit 4195G

7    actually did have valve surgery as opposed to they

8    had a complaint that mentioned something about valve

9    surgery?

10         A.       I sat and reviewed these reports

11   and looked at them to see that it said they had valve

12   surgery.  Now --

13         Q.       So they should not be included if

14   all there was was a complaint that said these people

15   have suffered various problems, one of which is valve

16   surgery?

17         A.       If that's what the native said, I

18   don't think that that would be in here.  But if they

19   put it into the system in a different way that said

20   these people had valve surgery, then I don't have --

21   I mean the narrative says had valve surgery.  It's

22   there.

23         Q.       Did you notice that there were a

24   series where the reports were all received on a

25   specific day and that there are a whole bunch of

1   alleged valve surgeries received the same day that

2   were described the same way?

3            A.       I don't recall one way or the

4   other.

5            Q.       Now, H is exactly the same thing as

6   G.  It's just based on mitral or unspecified valve

7   surgery, whereas G is based on aortic?

8            A.       And they are mutually exclusive.

9            Q.       Okay.  And they are -- you

10   generated exactly the same way?

11            A.       Done the same way.  This just said

12   it was either mitral or unspecified.

13            Q.       Now, I mean just -- I picked up a

14   random page here --

15            A.       Uh-huh.

16            Q.       -- of H.  On page 28 it talks in

17   the first description, initial information was

18   received from an attorney regarding A.

19                     Did you ever attempt to do anything

20   to identify or call out one that came from legal

21   complaints?

22            A.       No.

23            Q.       Okay.  And do you have any

24   understanding about H, how many of these are actually

25   the result of lawsuits?

1           Q.      Okay.  Just some expert eventually

2    was supposed to take what you did here with 4195G and

3    4195H and then make their own determination about

4    what this meant?

5           A.      Correct.

6           Q.      You're not offering any opinions

7    about what any of this means; right?

8           A.      All I can say is there are a number

9    of reports in the database that appear to say that

10   the person had some kind of valve replacement

11   surgery.

12          Q.      And you're not saying if that's a

13   lot or a little or more than expected based upon

14   background records?

15          A.      I have no opinion based on that.

16                  MR. ALEXANDER:  We'll mark as

17   Exhibit 12, 4195I.

18                  (Deposition Exhibit 12 was marked

19   for identification and attached hereto.)

20          Q.      And as I understand it, 4195I is

21   now based upon the SQ database as opposed to the

22   CDSSS database?

23          A.      That is correct.

24          Q.      Now, again you made no attempt to

25   determine which of these 372 reports were the result

1    somebody didn't really have primary pulmonary

2    hypertension and valvular heart disease resulting in

3    valve surgery; right?

4                    MR. ADAMS:  Objection to form and

5    scope.

6           A.        I'm just -- that's for some expert

7    to decide what the meaning of this is.  All I did was

8    present a report of what's in the database that says

9    valve replacement surgery.

10          Q.        Do you know if actually the

11   majority of the entries on Exhibit 4195I are the

12   result of this kind of boilerplate language from

13   complaints without any evidence that the individual

14   actually had valve surgery?

15          A.        Your database says that this person

16   had valve surgery, it's on that list.

17          Q.        Well, the database doesn't say

18   valve surgery.  It just repeats the language from the

19   complaint, doesn't it?

20                    MR. ADAMS:  Objection to form and

21   foundation; a mischaracterization.

22          A.        The database -- what you have is a

23   printout of exactly what the database says.

24          Q.        Did plaintiffs -- did any of the

25   plaintiff's lawyers ever tell you that the majority

1    Exhibit 13, 4195J.

2          A.      Okay.

3          Q.      And there's actually no information

4    in this complaint about these individuals having this

5    particular problem.  It's the same language in here

6    when it describes the injury that they have suffered

7    where it gives this list of various different types

8    of problems collectively?

9          A.      I just thought I saw it here where

10   it said --

11                 MR. ADAMS:  I'm sorry.  Was there a

12   question?

13         Q.      Do you know if that's right, what I

14   just said?

15         A.      They appear to come from the same

16   complaint.  I also look here and it says medical

17   records are on file.

18         Q.      Uh-huh.

19         A.      And one would assume that they

20   would have gotten medical records and would have

21   adjusted the terms on the report through the revision

22   process of which the company actively does as we've

23   discussed before, that they would have adjusted the

24   terms to reflect that particular person.

25         Q.      Do you know how many, if any, of

1    these people had valve surgery actually?

2         A.       I can only go by what the company's

3    database says.

4         Q.       So what you've done is when you

5    have dozens of people listed on the same complaint

6    that has the same language alleging a common injury,

7    is you've included all of them; right?

8         A.       Your database listed reports that

9    specified surgery.  That is the list I provided here.

10        Q.       Well, I can show you the part of

11   the complaint.  It's from page 22 of this particular

12   complaint, and you see where it says, as a direct

13   result, the plaintiffs have sustained -- and it

14   refers to a whole bunch of plaintiffs simultaneously.

15   They're not broken up individually -- serious and

16   permanent injuries, including but not limited to, and

17   then it gives a list A through P, which includes

18   valve surgery?

19        A.       Okay.

20        Q.       Do you see that?

21        A.       Okay.

22        Q.       And that's consistent with looking

23   at the data that you have that there's no allegation

24   that each of these people actually had valve surgery.

25   But you've included every single one of them on your

1      list, 4195J, as if they had actually had valve

2      surgery --

3                        MR. ADAMS:  Objection to form.

4              Q.       -- is that right?

5                        MR. ADAMS:  It mischaracterizes the

6      document.

7              A.       Well, I provided what's in the

8      data.  If the database says valve surgery, this --

9      the database was produced to me after three years

10     after that complaint was drawn.  One would have

11     thought you would have updated the narratives to

12     reflect the entries for each person.  It says that

13     you have the medical records on file, so one would

14     assume that they didn't do it.  You know, so there

15     it's -- that's how it's done.

16             Q.       Well, how many of the valve

17     surgeries in 4198I, J or K are exactly like this,

18     that there is no evidence the person actually had

19     valve surgery; it's just part of a laundry list

20     allegation in the complaint?

21                        MR. ADAMS:  Objection to form.

22             A.       I don't agree that there's no

23     evidence.

24             Q.       I'm asking how many of them have no

25     evidence that that particular individual had valve

1      surgery?

2              A.      There's evidence because your

3      company put it in the database that way.

4              Q.      Other than how it was in the

5      database where --

6              A.      Well, I don't know what -- sorry.

7              Q.      Other than repeating the language

8      from the complaint, which is what you see exactly

9      happened, how many of the people in these reports I,

10     J and K have no other evidence that they actually had

11     valve surgery?

12                     MR. ADAMS:   Objection to form.

13             A.       I have no way to know that, because

14     your client who -- this database was given to me

15     three years after that complaint came in the door.

16     Your client says medical records were on file, and

17     clearly your client had an opportunity to make sure

18     their adverse event database was consistent with the

19     current state of medical knowledge based on those

20     reports.  If they didn't do that, then maybe this is

21     correct.  So to say that there's no evidence, I can

22     only go by what's in your database.

23             Q.      I'm asking what you know.  Do you

24     know if those people who have this language included

25     from their complaint in the narratives actually had

1    valve surgery?

2              A.       I am going by what the database

3    says.  I don't know these people personally.  All I

4    can do is tell you what your database says.

5              Q.       Are you in a position to dispute

6    the following; that out of these three charts, 437 of

7    the reports did not have valve surgery?

8                       MR. ADAMS:  Objection to form and

9    foundation.

10             A.       Well, it's kind of a --

11             Q.       Can you dispute that number?

12                      MR. ADAMS:  Objection to form and

13   foundation.

14             A.       I don't have any reason, but you've

15   included reports that I've acknowledged don't have

16   valve surgery, so I don't even know why you've done

17   that.

18                      You know, a meaningful number would

19   be what -- how many in this chart don't have valve

20   surgeries.  But to include the one that I say doesn't

21   include -- those people didn't have valve surgeries

22   is kind of meaningless.

23             Q.       Okay.  Well, then I'm sorry.  I'm

24   actually -- let me limit it then to 12 and 13.

25   Between them they have a total of 649 entries; right?

1          A.        277.  It looks that way.

2          Q.        372.

3          A.        That would be 649, yeah.

4          Q.        Okay.  So between Exhibits 12 and

5    13 to your deposition, the charts I and J, you have a

6    total of 649 surgery reports.  Can you say how many

7    of them actually had surgery on their valves because

8    of anything?  Let's just start with valve surgery.

9                    MR. ADAMS:  Objection to form and

10   scope.

11         A.        Your database says 649 had surgery.

12   I have no other number I can give you.

13         Q.        Do you know if 437 of them were

14   people who didn't have valve surgery --

15                   MR. ADAMS:  Objection to form and

16   foundation.

17         Q.        -- according to any information

18   that was available?

19         A.        All I have is what's in this

20   database here.

21         Q.        Are these limited to U.S. cases?

22         A.        No, unless the data produced to me

23   limited it to U.S. cases.

24         Q.        Well, that includes published

25   literature; right; which can be from other countries;

1    hypertension with the Pondimin that occurred in the

2    fall of maybe August or September of 1995, that's not

3    reflected here?

4                    MR. ADAMS:  Objection to form.

5         A.      Ask that question again.  I'm

6    sorry.

7         Q.      Well --

8         A.      I don't mean to rephrase it.  I

9    just missed it.

10        Q.      That's fine.  On September 8, 1995,

11   Wyeth told the FDA that there had been 51 foreign

12   reports of pulmonary hypertension with Pondimin and

13   one United States report of pulmonary hypertension

14   with Pondimin.

15                   That's not reflected on your chart,

16   4195L, is it?

17                   MR. ADAMS:  Objection to form and

18   foundation.

19        A.      If it took place, and I don't know

20   whether it did or it didn't, the company didn't

21   reflect it in its database.

22        Q.      And if FDA had these reports from

23   another means, that's also not reflected on column C

24   or in this chart at all?

25        A.      Well, I'd be gravely concerned if

1    foundation.

2          A.      If that's how the company would

3    have coded it.

4          Q.      And again, you don't know how they

5    coded it?

6                  MR. ADAMS:  Objection to form; a

7    mischaracterization.

8          A.      They coded it as valvular heart

9    diease.  It's on the list.

10         Q.      I'm sorry.  You don't know what

11   Wyeth's criteria were for coding something as

12   valvular heart disease, do you?

13         A.      That's correct.

14         Q.      So do you know how many of the

15   entries on 4195M actually have FDA positive left

16   sided regurgitation?

17         A.      I don't.

18         Q.      You know that there are entries

19   here that have either no valvular regurgitation or

20   right sided valvular regurgitation or just trace left

21   sided regurgitation, don't you?

22                 MR. ADAMS:  Objection to form.

23         A.      I don't have any knowledge at all.

24   I don't.  You asked me, and I don't know.  I didn't

25   look.

1    anything?

2         A.    They can do that if they choose to

3    do that.

4         Q.    And you obviously -- well, frankly

5    you didn't have any exclusion criteria, did you?

6         A.    No.

7         Q.    And --

8         A.    Other than -- well, that's not

9    true.  I mean it had to be, you know, 15 to 60 days.

10   I think for -- because of the way the duration data

11   had been entered, I excluded from CDSSS things that

12   had more than one entry of durations.  I threw those

13   out, so I probably threw some away.  If it didn't

14   have start and end dates, I threw those away; so

15   yeah, I did have exclusion data.  I had to have a

16   good start and a good end date, and I view this as a

17   -- you know, as a floor of the number of reports

18   coded as valvular heart disease with those durations.

19        Q.    But you did not intend to include

20   anybody who took a total of Pondimin and Redux for

21   more than 60 days on Exhibit 4195M, did you?

22        A.    I did not intend to do that, and if

23   that date -- if the duration data as entered by the

24   company is incorrect, it is possible that this number

25   might be incorrect.

1          Q.        I'm not done.

2                    You just went on Box C3?

3          A.        No, I did not.

4          Q.        Okay.  What did you go on?

5          A.        I went in the company's database

6     that reflects each and every drug that the person

7     took, and there could be 27 drugs in there and how

8     long they took it for.  So no, I did not sit and look

9     at the med watch reports in any way, shape or form.

10    This is completely generated from within their

11    database.

12         Q.        How did this one fall through the

13    cracks?

14                   MR. ADAMS:   Objection to form; it

15    mischaracterizes.

16         A.        Well, let's take a look and see.

17    If we take a look at the company's database and if

18    they didn't enter the fact that the person took Redux

19    for two months, it may have fallen through the cracks

20    that way.

21         Q.        You're saying that the only way

22    this would have fallen through the cracks is if Redux

23    wasn't entered into the database?

24         A.        If they didn't put duration data

25    down for Redux, that's probably how it fell through

1    the cracks.  If you'd like, we can -- or I can look

2    at the raw data of that particular report and we can

3    come to that conclusion, or I'll research that for

4    you and get back to you on it.

5                    MR. ALEXANDER:  This is -- I've

6    marked it at Plaintiff's counsel's request.  Exhibit

7    17 is the ADE that I was just referring to, but it

8    correlates to entry number 17 on Exhibit, Deposition

9    Exhibit 16, which is 4195M.

10                   THE WITNESS:  Uh-huh.

11                   (Deposition Exhibit 17 was marked

12   for identification and attached hereto.)

13        Q.        And you acknowledge then that this

14   is somebody who took for more than 60 days and

15   shouldn't be included as a list -- as somebody who

16   took for 15 to 60 days; right?

17                   MR. ADAMS:  Objection to form.

18        Q.        Do you agree with that?

19                   MR. ADAMS:  Do you understand his

20   question?

21        A.        I would agree that the company

22   didn't data enter this report correctly.

23        Q.        It shouldn't be on this chart?

24        A.        No, it should be on this chart and

25   the reason it should be on this chart is because

1    that's the way the company put the data in the

2    database.

3              Now I want to make something very

4    clear here.  The chart is not in error.  The database

5    is in error.

6         Q.      Did you actually look at any of the

7    underlying source material or did you just go off the

8    database?

9         A.      I went off the database.  The

10   database generates the source material.

11        Q.      Let's pick another one out.  It's

12   the sixth entry you have here.

13        A.      Okay.

14        Q.      Just take a look at that.  I'll

15   hand you the med watch form that correlates with the

16   sixth entry on 4195M.

17              Why is that included as a report of

18   valvular heart disease?

19        A.      This is the additional report.  It

20   could have been done from a follow-up report, so it

21   was coded by the company at some point as valvular

22   heart disease.

23        Q.      Do you know if there's another

24   follow-up report on this ADE?

25        A.      Well, let's get the database and

1    to represent that there are more cases of short-term

2    usage and valvular regurgitation than would be

3    expected; right?

4           A.       I don't have an opinion one way or

5    the other.

6                    MR. ALEXANDER:  Exhibit 19 is

7    4195N, and this is pulmonary hypertension reports 15

8    to 90 days duration.

9                    (Deposition Exhibit 19 was marked

10   for identification and attached hereto.)

11          Q.       Is this a subset of L?

12          A.       No.

13          Q.       This is an update based on

14   different search criteria?

15          A.       It was done exactly the same way.

16   It's just that the term is pulmonary hypertension as

17   opposed to valvular heart disease.  But any of these

18   issues you brought out of the last one would be

19   issues with this one.  It was done exactly the same

20   way, the same criteria.

21          Q.       If somebody took Pondimin plus

22   Redux for more than 90 days, should that be included

23   here on this report, 4195N?

24                   MR. ADAMS:  Objection to form.

25          A.       If your database says that -- if

1    the database says they took it for less than 90 days,

2    it should show up here.  And if the database is

3    wrong, I can't help it.

4         Q.      You didn't review the ADE files or

5    med watch forms or anything like that for 4195N?

6         A.      No.  I relied upon the same

7    database that the company relies upon to conduct its

8    daily safety surveillance, so that seemed to me to be

9    reasonably reliable.

10        Q.      Does this include cases of

11   pulmonary hypertension that developed before the

12   person was on the drug?

13        A.      I have no way to know one way or

14   the other.

15        Q.      Does this limit it to primary

16   pulmonary hypertension?

17        A.      I don't -- I have no way to know

18   one way or the other.

19        Q.      You know that cases are coded as

20   pulmonary hypertension even if it's pulmonary

21   hypertension associated with a secondary cause;

22   right?

23        A.      I think that's how they did it.

24        Q.      And again, you're not in a position

25   to say that this represents more than would be

1   10/15/71.  The second one is 6/22/72.  Pondimin

2   wasn't on the market in the United States at that

3   time; right?

4           A.      I think that's correct.

5           Q.      Why are they in the database as

6   post-marketing reports?

7           A.      Because the company might have

8   entered them at that point.  I don't know why the

9   company entered the -- entered reports into the

10  database.

11          Q.      Do you know what these reports are

12  about at all?

13          A.      If I open up the database, I could

14  tell you everything you want to know about them.  But

15  not to --

16          Q.      You're not saying -- I'm sorry.

17  You're not saying that any of these pre-1990 reports

18  have anything to do with pulmonary hypertension or

19  valvular heart disease?

20          A.      It wasn't the purpose of the chart.

21  It was just simply a list of just how many reports

22  there, the company had as of March 1st of 1995 in its

23  database.

24                  MR. ALEXANDER:  And I've marked

25  4195T as Exhibit 24 to your deposition.